Upon review of all of the competent evidence of record with reference to the errors assigned, and finding no good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, the Full Commission AFFIRMS with minor modifications the Decision and Order of the deputy commissioner as follows:
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties in a Pre-Trial Agreement and at the hearing as:
 STIPULATIONS
1. The parties are properly before the Commission and the Commission has jurisdiction of the parties and of the subject matter.
2. The parties have been correctly designated and there are no questions as to misjoinder or nonjoinder of parties.
3. The parties have stipulated to the plaintiff's medical records, including medical records and pre-trial depositions from Henry Tonn, M.S.; Edward Rydzak, M.D.; James Wortman, M.D.; and medical records from North Carolina Memorial Hospital, Columbus County Hospital, New Hanover Regional Medical Center, The Brunswick Hospital, Southeastern Pathology Associates, P.A., Wilmington Health Associates, P.A., Hanover Medical Specialists, and Southeastern Medical Associates.
4. The parties stipulated to a Statement regarding Robert Sandler, M.D.
5. The issues presented are:
 (a) Whether Dr. Mahajan told the plaintiff during a telephone conversation on March 31, 1993 that during her endoscopy procedure on March 30, 1993, the physician performing the procedure, Dr. Rydzak, at the time he performed the procedure, had blood from two people on his hands?
 (b) If so, whether this telephone conversation caused the plaintiff to suffer any emotional distress?
 (c) If so, what amount, if any, is the plaintiff entitled to recover from the defendant?
 ***********
Based upon all of the competent evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff filed a tort claim against U.N.C. Hospitals alleging negligent infliction of emotional distress arising from medical treatment provided by Dr. Suresh Mahajan and Dr. Edward Rydzak.
2. At the time of the hearing before the deputy commissioner, the plaintiff was 52 years old and had completed the ninth grade. The plaintiff was last employed in 1986 as a ceramics instructor at Cape Fear Community College.
3. Dr. Suresh Mahajan is a physician specializing in gastroenterology and internal medicine who currently practices in Middleburg Heights, Ohio. Dr. Mahajan is from India and speaks English with a foreign accent. Dr. Mahajan completed college and received his medical degree in India and in 1984 began his pediatric residency at Methodist Hospital in Brooklyn, New York. He followed this with a residency in internal medicine at the Aultman Hospital in Canton, Ohio for three years. Dr. Mahajan then was accepted to a gastroenterology fellowship at U.N.C. Hospitals in Chapel Hill, North Carolina for three years. Dr. Mahajan is presently board certified in internal medicine and gastroenterology.
4. Dr. Edward Rydzak is in the private practice of gastroenterology in Savannah, Georgia, and works with the resident teaching program in gastroenterology at Memorial Hospital in Savannah, Georgia. Dr. Rydzak was an instructor for the Department of Medicine at the University of North Carolina, and a Fellow in the Division of Digestive Disease and Nutrition at U.N.C. Hospitals from July, 1991 through June, 1994.
5. Nurse Meredith Reinhold recently retired from U.N.C. Hospitals where she was employed as a Registered Nurse for eighteen (18) years. She had been in active practice as a Registered Nurse for 28 years. She began her employment at U.N.C. Hospitals in 1975 and at the time of the alleged incident, Nurse Reinhold was the nurse supervisor for gastroenterology.
6. Dr. Shaba Farias was the plaintiff's family physician. Dr. Farias referred the plaintiff to Dr. Baduvanda Changappa, a surgeon in Whiteville, North Carolina for ulcer treatment. Dr. Changappa referred the plaintiff to the Gastroenterology Department at U.N.C. Hospitals in March of 1993.
7. On March 22, 1993, the plaintiff presented to U.N.C. Hospitals with a history of ulcers and was seen by Dr. Suresh Mahajan. Dr. Mahajan examined the plaintiff and based upon plaintiff's history and examination results, suggested further testing, including blood work and an upper GI endoscopy. Prior to leaving the hospital on March 22, 1993, blood was drawn from the plaintiff for the tests ordered by Dr. Mahajan and plaintiff was scheduled for an endoscopy procedure to be performed on March 30, 1993.
8. The plaintiff presented to the Gastroenterology Department at U.N.C. Hospitals on March 30, 1993. Upon arrival, blood was again obtained from her prior to the endoscopy procedure. Plaintiff was then introduced to Dr. Rydzak who was scheduled to perform the procedure. The risks and benefits of the procedure were explained to the plaintiff and she signed an Informed Consent Form indicating her willingness to go forward with the procedure. The plaintiff alleged and later testified that the U.N.C. Hospitals changed the consent form that she signed prior to the endoscopy procedure on March 30, 1993. The plaintiff believes that the words "with possible" were not on the original document she signed and that these words were added at a later date.
9. Dr. Rydzak performed the endoscopy procedure, following normal medical protocol and using uncontaminated sterile instruments and materials. There was a nurse there to assist Dr. Rydzak as well as an attending physician, Dr. Robert Sandler.
10. After the procedure was completed, plaintiff was taken to a recovery room for the sedative to wear off. Dr. Mahajan spoke with Dr. Rydzak about the procedure and about the fact that Dr. Rydzak saw no ulcers. Dr. Rydzak took a biopsy of the stomach lining to perform a CLO test to determine whether bacteria was present in the stomach lining which could contribute to or cause ulcers.
11. Dr. Mahajan explained to the plaintiff that Dr. Rydzak saw no ulcers during this study, but that her biopsy results were still pending and that he would call her the next day to discuss the results.
12. On March 31, 1993, Nurse Meredith Reinhold, in accordance with the Blood Borne Disease Protocol, informed Dr. Mahajan that while she was cleaning the endoscope which had been used during the procedure on the plaintiff, she accidentally pricked herself with a needle, breaking her skin to the point that her finger bled. Nurse Reinhold explained to Dr. Mahajan that after she had tried to flush out all of the channels of the endoscope, she had observed a particle or particles trapped under the hood of the endoscope. She then used a 25 gauge needle to scrape out under the hood to remove the remaining particles and accidentally stuck herself with the needle, causing her to bleed. She expressed her concern that the particles that she was cleaning out with the needle were either blood and/or bodily fluids from the plaintiff, and pursuant to the U.N.C. Blood Borne Disease protocol, she was reporting this in order that steps might be taken to insure that she had not been contaminated by exposure to the blood and/or bodily fluids from the plaintiff.
13. Dr. Mahajan was concerned about the possible exposure of Nurse Reinhold to HIV and/or hepatitis. The results of the blood work on the plaintiff from her March 22, 1993 visit indicated the possibility of liver disease which in turn could indicate the presence of hepatitis. Dr. Mahajan informed Nurse Reinhold of his concerns and pursuant to her request, good medical judgment and the policies and procedures at U.N.C. Hospitals after an accidental needle stick, Dr. Mahajan called the plaintiff to inform her of the problem and to obtain her consent to test the blood sample which had been taken from her prior to the endoscopy procedure for possible contaminants that might endanger Nurse Reinhold.
14. On March 31, 1993, Dr. Mahajan and the plaintiff spoke over the telephone. The plaintiff testified that during this conversation, Dr. Mahajan told her that there were no biopsy results because the specimen was contaminated because Dr. Rydzak had blood from two different sources on his hands at the time he performed the endoscopy procedure. This blood allegedly was introduced into her body via the endoscope. The two sources of the blood allegedly were the blood of Dr. Rydzak and the blood of another patient. The plaintiff testified that Dr. Mahajan told her Dr. Rydzak pricked himself with a needle that had been used on another patient and was contaminated with the other patient's blood, thereby contaminating the plaintiff with the blood of Dr. Rydzak and the blood of another patient.
15. The plaintiff further testified that Dr. Mahajan told her he did not understand why Dr. Rydzak went forward with the procedure and used the contaminated instrument when there were other sterile instruments in the room that he could have used instead. Dr. Mahajan allegedly told the plaintiff that they needed to test her blood sample for the presence of HIV and that they needed to do another endoscopy because the biopsy was contaminated with the blood of two other people. The plaintiff testified that Dr. Mahajan obtained her consent to do an HIV test on the blood sample that had been drawn from her prior to the endoscopy procedure.
16. Dr. Mahajan testified that he told the plaintiff that Nurse Reinhold accidentally pricked herself with a needle while cleaning the endoscope following its use during the endoscopy procedure on plaintiff, and that as a precaution to Nurse Reinhold they wanted to check plaintiff's blood for HIV and/or any other possible contaminants. Dr. Mahajan testified that the plaintiff was coherent during their telephone conversation and seemed to understand the situation and had given her consent for her blood sample to be tested as requested. When Dr. Mahajan ended the conversation, he was content that the plaintiff understood the situation. Plaintiff did not ask him any questions; she did not seem to be alarmed at all; and she seemed to understand that the hospital was going to test her blood sample obtained prior to the endoscopy procedure to see if Nurse Reinhold was exposed to any contaminants as a result of her needle stick.
17. Dr. Mahajan testified that he never told the plaintiff that her specimen was contaminated with the blood from two different people because this simply did not happen. Dr. Mahajan further testified that at no time during his conversation with the plaintiff did he mention, allude to, or say anything about the biopsy being contaminated or that Dr. Rydzak performed the endoscopy procedure with the blood from two different sources on his hands.
18. Dr. Mahajan received the results of the authorized tests of plaintiff's blood sample a couple of days later and called the plaintiff's home to inform her that the HIV test was negative. The plaintiff was not at home so he spoke with her husband, Silas King, and gave him this information. Mr. King agreed to pass on this information to the plaintiff.
19. The plaintiff testified that she understood that the blood sample which was tested for HIV was drawn from her prior to the endoscopy procedure and prior to her alleged contamination.
20. After the telephone call from Dr. Mahajan on March 31, 1993, the plaintiff called an attorney, David Kirby. Mr. Kirby called and spoke with Dr. Mahajan about plaintiff's allegations. Dr. Mahajan told Mr. Kirby the same facts that he testified to at the hearing. He informed Mr. Kirby of the accidental needle stick to Nurse Reinhold while she was cleaning the endoscope following its use in the endoscopy procedure on plaintiff and that he thereafter requested plaintiff's permission to test her blood sample for possible contaminants as a precaution for Nurse Reinhold's protection. After speaking with Dr. Mahajan, Mr. Kirby called the plaintiff and told her what Dr. Mahajan had told him. The plaintiff became upset and alleged that Dr. Mahajan was lying. Plaintiff then called Dr. Mahajan and spoke with him. During this telephone conversation, Dr. Mahajan again explained to the plaintiff about Nurse Reinhold's accidental needle stick and the need to test plaintiff's blood sample as a precaution to protect Nurse Reinhold from possible contamination.
21. Shortly thereafter, the Risk Management Department at U.N.C. Hospitals scheduled a meeting with the Legal Department at which Mr. Kirby was allowed to question Dr. Mahajan about the events of March 30 and 31, 1993. Dr. Mahajan again described the needle stick and the reasons for the HIV test on the plaintiff's blood. Nurse Reinhold was not present at the beginning of this meeting. Mr. Kirby requested to speak with Nurse Reinhold and she was called and came to the meeting. This was the first time Nurse Reinhold knew of the meeting and the first she had heard that there was any problem due to her accidental needle stick. The plaintiff testified that during this meeting a female attorney would not leave her in the same room with Dr. Mahajan because the attorney was afraid she would hurt Dr. Mahajan. In addition, the plaintiff stated that she believes that when the U.N.C. Hospitals' personnel left the room to place a call to Nurse Reinhold asking her to come to the meeting, they would not let Mr. Kirby go with them to make the call because U.N.C. Risk Management did not want Mr. Kirby to know about the conspiracy, which plaintiff alleged, of hospital and other medical personnel to conceal the hospital's alleged negligence.
22. When Nurse Reinhold arrived at the meeting, Mr. Kirby questioned her. She told of the events while cleaning the endoscope, the accidental needle stick, and of the fact that she informed Dr. Mahajan of the needle stick pursuant to hospital protocol. After this meeting, Mr. Kirby informed the plaintiff that he would not pursue her case.
23. The plaintiff testified that Dr. Mahajan was making up the story about which he testified and that Nurse Reinhold was picked at random and told to lie about the needle stick requiring an HIV test of the plaintiff's blood sample. The plaintiff further testified and alleged that Nurse Reinhold did not accidentally stick herself with a needle, that all of this constituted a conspiracy to cover up what had actually happened, and that "a game was being played." The plaintiff testified that U.N.C. Hospitals is covering up the truth about their negligence and that the conspiracy additionally involves the physicians in Whiteville, North Carolina, as well.
24. The plaintiff testified that she spoke with Dr. Changappa and told him that Dr. Rydzak performed the endoscopy procedure on her with the blood from two other sources on his hands. The plaintiff testified and alleged that after listening to her story, Dr. Changappa told her that that was nothing unusual and that surgeons operate with blood on their hands from other patients every day. He allegedly informed the plaintiff that on almost a daily basis a surgeon will operate on one patient and then switch to perform surgery on a second patient and not change his gloves and have the blood of the first patient on his hands at the time he performs the surgery on the second patient. The plaintiff testified that she is sure that Dr. Changappa told her this, and that she did not misinterpret what he had told her.
25. The Full Commission finds Dr. Mahajan to be a credible witness.
26. The plaintiff presented to Dr. Richard Berry's office on June 17, 1993 concerned that she had hemochromatosis. She informed Dr. Berry that she watched a movie on television the night before that dealt with a patient who had this disease. The plaintiff believed that she had this disease and wanted to be phlebotomized. Dr. Berry convinced her to first have other tests performed to see if additional studies were necessary. However, the plaintiff testified and alleged that Dr. Berry's note of June 17, 1993 regarding this incident is falsified. Dr. Berry's note indicates that the plaintiff asked for a blood test, but the plaintiff denies this stating that Dr. Berry ordered the test and that the plaintiff did not ask for one. The blood test of June 24, 1993, was again negative for HIV, although the plaintiff testified that she continues to be fearful on a daily basis of having HIV.
27. Dr. Edward Rydzak testified that at the time he performed the plaintiff's endoscopy procedure, he wore sterile gloves, used sterile materials, that there was no break in sterile technique, and that he performed a normal, unremarkable upper endoscopy with no complications. He testified that he did not have any blood on his hands — neither his own blood nor that of any other patient at the time he performed this procedure. Dr. Rydzak testified that he never told Dr. Mahajan that he performed this procedure with blood from two other sources on his hands. He testified that he did not stick himself with a needle moments prior to this procedure.
28. Dr. Rydzak further testified that if an employee sustains a needle stick while cleaning a contaminated endoscope or other equipment, any blood to which the stuck employee has been exposed must be tested for possible contamination in order to alert personnel as to what, if any, steps must be taken to ensure the employee's safety.
29. The Full Commission finds Dr. Rydzak to be a credible witness.
30. Mr. Henry Tonn is a psychologist practicing in Wilmington, North Carolina. He holds a Masters Degree. Mr. Tonn was requested by the plaintiff's attorney, Wayne Long, to administer an MMPI-2 test to determine whether or not the plaintiff really believes what she alleges she heard from Dr. Mahajan. Mr. Tonn was not asked to check the plaintiff's beliefs against the actual, real circumstances. Mr. Tonn was asked to perform a limited examination on the plaintiff, not a full scale forensic evaluation as he typically administers. Mr. Tonn was neither asked to review, nor did he review any of plaintiff's medical records or any of the depositions taken with regard to this matter and he had no information, either about the plaintiff's medical history, or the plaintiff's psychological make-up prior to the time he saw her.
31. Mr. Tonn opined that the plaintiff is overly concerned about the possibility of AIDS. Mr. Tonn agrees that people who are overly concerned with physical problems and who over-react to physical problems can sometimes develop a paranoid belief system, and that if such a person imagined and believed that something happened, they can present to a psychologist just as legitimately as if the event actually happened. Mr. Tonn determined that the plaintiff could have believed that something occurred at U.N.C. Hospitals when it actually did not occur, and that she could have still presented to him the same way she presented during his clinical interview and on the MMPI-2 test.
32. Dr. James Wortman, an internist, is trained in the recognition, diagnosis and treatment of emotional problems. Dr. Wortman based his opinions on his review of the plaintiff's medical records from U.N.C. Hospitals and her treating physicians, including the Columbus County emergency room; and the depositions of the plaintiff, Dr. Mahajan and Mr. Tonn.
33. Dr. Wortman noted that the plaintiff has been prescribed and has taken narcotic analgesics, including Percocet, Tylox, and Oxycodone, which are highly addictive. She has also been on Valium for treatment of acute anxiety. She was receiving these drugs prior to 1990. These medications carry possible side effects, including confusion, weakness, tiredness, hyperexcitability, anxiety, depression, anger and hostility. Withdrawal from these medications also brings side effects, including acute anxiety, rapid pulse, confusion, abdominal pain, abdominal cramping and disorientation.
34. Dr. Wortman also noted that after the March 30, 1993 incident, the plaintiff presented to the emergency department at Columbus County and was seen there a number of times, yet she never complained of her concern of AIDS, the fact that her life was ruined, the possibility of AIDS, or that her lifestyle had changed because of the events occurring at the U.N.C. Hospitals about which she now expresses her concerns.
35. Dr. Wortman opined that the plaintiff was suffering from a number of emotional problems in March of 1993, including hypochondriasis. Dr. Wortman further opined that the plaintiff was suffering from paranoia during this time period, exhibited a drug seeking behavior, and had phobias. In addition, plaintiff scored high on the MMPI test scale for hysteria.
36. Dr. Wortman testified that his evaluation and analysis of the plaintiff's deposition indicated that the plaintiff suffered from paranoia in March of 1993 because she thought there was a conspiracy among the doctors to hide the fact that she may have AIDS, that Nurse Reinhold was not telling the truth concerning her needle-sticking accident, and that Nurse Reinhold was forced to testify falsely. Dr. Wortman also observed that the plaintiff had testified concerning cover-ups by the medical profession and that this indicated to him that the plaintiff was suffering from paranoia in March of 1993. In addition, Dr. Wortman observed that the plaintiff was not showing logical thinking when she testified that Dr. Changappa told her that he operated with hands blooded from other patients everyday, and that doctors go from one patient to another in the operating room with blood on their hands.
37. Dr. Wortman opined that the plaintiff's statements concerning Dr. Changappa operating with blood on his hands, the plaintiff's misinterpretation of the telephone call with Dr. Mahajan, the plaintiff's opinion that Nurse Reinhold is lying about the needle stick, the plaintiff's own testimony about the conspiracy and cover-up between her local physicians in Chapel Hill, North Carolina and U.N.C. Hospitals, and U.N.C. Hospitals changing her Consent Form are all bizarre stories and are consistent with her emotional problems.
38. Dr. Wortman determined that the emotional problems suffered by the plaintiff could cause her to misinterpret information delivered by Dr. Mahajan over the telephone in March of 1993. It is his opinion that her hypochondriasis, hysteria, phobias and paranoia could have led to her conclusions once she heard the word AIDS.
39. The Full Commission finds Dr. Wortman to be a credible witness.
40. Dr. Claudia Coleman is a practicing psychologist and holds a Ph.D. Dr. Coleman's present practice consists of forensic and neuropsychology. She presently specializes in psychological and neuropsychological assessment and forensic assessment, both criminal and civil. Dr. Coleman's evaluation of the plaintiff was based on the plaintiff's medical records, psychological testing results, statements and general findings in the plaintiff's medical records and depositions. She testified that there are some people who once they misinterpret a certain fact, cannot be talked back into reality or a rational belief system. Dr. Coleman opined that this is what happened to the plaintiff. The depositions, statements and psychological evaluation of plaintiff indicate that she has a paranoid belief system, thus believing that she is being conspired against, maligned and harassed, and she is extremely prone to misinterpret very benign remarks or events and tends to exaggerate even small slights. Dr. Coleman stated that a paranoid individual, like the plaintiff, incorporates a variety of very innocuous events into their thinking process and are very firm in their beliefs that these things are going on, but that they ascribe very sinister meaning and very persecutory meanings to very innocuous events. The plaintiff maintained her paranoia despite objective, factual evidence to the contrary.
41. Dr. Coleman was of the opinion based on her review of the plaintiff's medical records, the MMPI, and the depositions; that in March of 1993, the plaintiff was suffering from psychological problems that led her to believe that there was conspiracy against her at U.N.C. Hospitals and also a conspiracy against her between her hometown physicians, Dr. Berry, Dr. Farias and Dr. Changappa.
42. The Full Commission finds Dr. Coleman to be a credible witness.
43. The competent evidence in the record establishes that the plaintiff, in March of 1993, already suffered from psychological problems that caused her to misinterpret the information relayed to her by Dr. Mahajan on March 31, 1993. Dr. Mahajan's March 31, 1993 telephone conversation with the plaintiff did not cause the plaintiff to suffer any emotional distress.
44. Plaintiff has not proven by the greater weight of the evidence that she suffered emotional distress as a proximate result of the negligence of defendant or its employees or agents.
 ***********
Based on the foregoing findings of fact and stipulations, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. The plaintiff failed to prove by the greater weight of the evidence that Dr. Mahajan told her that Dr. Rydzak had the blood of two people on his hands when he performed the plaintiff's upper GI endoscopy procedure on March 30, 1993, or that Dr. Rydzak was negligent in any way in providing medical treatment to plaintiff.
2. The plaintiff failed to prove by the greater weight of the evidence that Dr. Mahajan was negligent in any comments or conversation with her, or in delivering any sort of information to her on March 31, 1993 or that any emotional distress she may have suffered was proximately caused by the negligence of Dr. Mahajan or Dr. Rydzak.
3. In order to prevail under the Tort Claims Act, the plaintiff must prove negligence on the part of a named state employee arising out of and in the course of his employment.Ayscue v. North Carolina State Highway Commission,270 N.C. 100, 153 S.E. 823 (1967).
4. Plaintiff has not proven negligence on the part of any named officer, employee, involuntary servant or agent of the State while acting within the scope of his employment and duty which proximately caused the plaintiff to suffer any emotional distress. The plaintiff is not entitled to damages. N.C. Gen. Stat. § 143-291 et. seq.
 ***********
Based upon the foregoing stipulations, findings of fact and conclusions of law, the Full Commission enters the following:
 ORDER
1. The plaintiff's claim is and under the law must be DENIED.
2. Each side shall bear its own costs.
 S/_____________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
S/_____________ LAURA K. MAVRETIC COMMISSIONER
S/_____________ CHRISTOPHER SCOTT COMMISSIONER